1. Serial No. 623,543, entitled "High Impact Blends of Polyvinyl Chloride and

52 CCPA

James U. MANN, Appellant,

v.

Byron H. WERNER and Robert J. Reid, Appellees.

Patent Appeal Nos. 7381, 7382.

United States Court of Customs and Patent Appeals.

July 1, 1965.

Maurice B. Stiefel, Robert J. Patterson, New York City, for appellant.

Stanley M. Clark, Willard L. G. Pollard, Akron, Ohio, for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

SMITH, Judge.

Appellees, Werner and Reid, filed their patent application [1] on November 21,

Graft Polymer," assigned to the Firestone Tire and Rubber Company.

1956. Appellant Mann's application[2] was filed February 14, 1958. Two interferences were declared, with Mann as the junior party in each.[3] In separate decisions, the Board of Patent Interferences awarded priority of invention to appellees in both interferences. Mann appeals from both decisions.

Although the interferences were separately declared and decided, the issues are for practical purposes identical, and appellant therefore elected to treat them as one for purposes of taking testimony below and on appeal here. Accordingly, both appeals will be disposed of in this opinion.

In interference 91,206 the single count is:

A composition obtained by polymerizing 50 parts by weight of a polymerizable material consisting of methyl methacrylate while in intimate contact with 50 parts by weight of a butadiene homopolymer.

In interference 91,208 the single count is identical, except that the polymerizable material is a mixture of methyl methacrylate and styrene containing at least 50% by weight of methyl methacrylate.

In such compositions, some of the monomer (methyl methacrylate alone, or methyl methacrylate and styrene) is said to form a "graft" copolymer with the butadiene homopolymer. The resulting copolymers have both resinous and rubbery properties and can be blended with a resin to produce tough, impact-resistant "gum plastic" substances which are useful in the fabrication of many articles such as radio cabinets, automobile parts, etc., in which impact resistance is a desired property.

Appellees introduced no evidence, electing to rely upon the filing date of their application as establishing a date of constructive reduction to practice. Consequently, the issue here, as it was before the board in both interferences, is whether Mann has proved actual reduction to practice of the inventions of the counts prior to appellees' filing date. To prove an actual reduction to practice, Mann introduced the testimony of a number of witnesses, as well as numerous exhibits. After a detailed consideration of this evidence, the board concluded that, as to the single count in each interference, Mann had shown utility for the compositions and had established, in every particular save one, actual preparation of the compositions. According to the board, the missing link in Mann's chain of proof was that the evidence failed to corroborate his assertion that one of the starting materials was in fact polybutadiene, a material called for in each count. In each case, board member Willner dissented, taking the position that the record as a whole provided sufficient corroboration of Mann's testimony regarding the starting materials and that actual preparation of the compositions of the counts had thus been proved.

Accordingly, the only question presented on this appeal is whether the record evidence supports appellant's assertion that polybutadiene was one of the starting materials used in preparing the compositions of the counts. Our review of the record has convinced us that the board erred and that the position of the dissenting examiner is in accordance with prevailing law. For the reasons set forth below, therefore, we find it necessary to *reverse* the appealed decision in each case.

The record shows that during the time of the alleged reduction to practice, Mann was employed as a chemist in the General Laboratories of U. S. Rubber at Passaic, New Jersey. Under the direct supervision of Mann at that time were one Herbert Maguire and his assistant, Stanley Bujas. The record clearly establishes, and the board so found, that Maguire

2. Serial No. 715,208, entitled "Composition," assigned to United States Rubber Company.

3. Patent Interference Nos. 91,206 and 91,208. A third party to each interference has not appealed. There was also a third interference, No. 91,207, from which appeal has apparently not been taken.

and Bujas, in May 1956, carried out bottle polymerizations wherein a substance alleged to be polybutadiene latex was utilized as the substrate in the preparation of the compositions of the counts. The determinative question is whether the record contains sufficient corroborative evidence to prove, by a preponderance of all the evidence, that such substance was indeed polybutadiene latex.

The critical bit of documentary evidence on behalf of Mann is Exhibit 2, which is a printed form titled "Chemical Processing Job Ticket" and bearing identification number "01228." It purports to be an order, submitted by Maguire, requesting the production of a polybutadiene latex for use in preparing the compositions of the counts. Mann relies upon this document, along with testimony of various witnesses, to corroborate his allegation that a polybutadiene latex was actually made and delivered to his co-workers.

The record establishes that this job ticket was directed to a group at the U. S. Rubber Laboratories known as the "Chemical Engineering Department" (also referred to by several witnesses as the "Pilot Plant" or "Buna shed"), and was a type of order form commonly used to requisition materials and services from that group. The Pilot Plant was, in the words of its supervisor, Walter Dunn, "a small group that was preparing— essentially doing a service job, preparing polymers for different departments in the Research Center [General Laboratories]." It was located in a smaller building separate from the one in which Mann and his associates worked.

The job ticket form, as initially filled out and signed by Maguire, contained a detailed list of materials, including quantities, and a seven step "loading procedure." Under "Type and Purpose" on the form there is the notation "Polybutadiene for MMA Grafts (Planner's ref. P–201–1)," [4] and the last step of the loading procedure reads "Deliver to planner as latex." In this instance the planner was Maguire, since he submitted the job ticket to the Pilot Plant.

One Franklin Miller was the chemical operator in the Pilot Plant who was assigned the job of weighing out the various materials called for in job ticket 01228. Miller testified that he had been working in the Pilot Plant since 1953, and described in some detail how he went about his work, the loading procedure, where various ingredients were obtained, etc. The ticket bears his initials under a column headed "Weighed By." We think the record fairly establishes that one of the materials which Miller loaded into a reactor to start the polymerization reaction was in fact butadiene. Miller testified he got butadiene gas from a tank in which it was normally kept, the tank being marked "Butadiene." On cross-examination, Miller testified further as follows:

XQ59. You stated you recognized the smell of butadiene? A. Yes.

XQ60. How would you characterize its odor? A. Well, it has a distinctive odor. It is similar to gasoline or illuminating gas. Similar. I don't say exactly. There is a difference. If you smell it as many times as it is necessary to smell it, using it every day, it is quite easily distinguished. ·

XQ61. Do you know what liquified propane smells like? A. I have smelled it several times.

---

4. Mann's Exhibit 1 is a substantially identical job ticket, bearing number 01221, submitted by Mann. On this ticket the planner's reference is P–201. Mann testified that "The 201 is my code. Dash-one means that it was done over again." When asked what happened in connection with job ticket 01221, Mann stated: "The reaction proceeded. We formed our polymer. We got some flocculation toward the end of the run and threw it out, discarded this batch. We wanted to use it as latex, so the premature coagulation of some of the polymer would spoil it for that purpose." This explains why it was necessary to have the Pilot Plant repeat the procedure originally outlined in ticket 01221.

XQ62. How does the smell of this so-called butadiene compare with the smell of liquid propane? A. It is quite similar, but the fact that we didn't have any liquid propane on the premises at that particular time would mean that I couldn't have mixed it up.

XQ63. Did you have any other gases on the premises besides butadiene? A. There was only one other material that we had on the premises at that time that is anywhere similar to butadiene, and that is vinyl chloride, and the smell of those two chemicals are [sic] vastly different.

\* \* \* \* \* \*

Dunn, Miller's supervisor, identified the source of the butadiene used in the Pilot Plant as The Matheson Company, a reputable supplier, and testified that the procedure was for the Pilot Plant to send empty cylinders to Matheson, where they would be filled with the butadiene gas and returned.

The back side of job ticket 01228 includes a table titled "Reactor Log," with columns variously headed "Reaction Time," "% Solids," "Pressure" and "Internal Temp." The data contained in the table provide a running account of the polymerization reaction as it progressed, and the entries are initialed by various operators including, in addition to Miller, Colby Remick, James Farrar and Ed Schreiber. The front side, under the heading "Weights and Chemicals Checked Before Loading by," bears the initials of Donald Winslow, who supervised the work of the operators in the Pilot Plant. Of the aforementioned persons, only Remick and Schreiber failed to testify on behalf of Mann. The ticket also bears the notation "Delvd to planner 5/9/56 ES." Regarding this notation, Winslow testified:

Q81. \* \* \* Can you explain the significance of that entry? A. By the initials, Ed Schreiber delivered to planner, who is H. W. Maguire, on 5–9–56 a can of latex labeled "01228".

Q82. Corresponding to the product of this run? A. Corresponding to this product, as requested by planner, in "Loading procedure," Step 7, "Deliver to planner as latex".

Q83. Was this fairly standard procedure? A. Very standard procedure.

Q84. Would you have any reason to believe that Schreiber had not, in fact, delivered the latex? A. No.

With regard to the significance of job ticket 01228 and the testimony relating thereto, the board commented:

Returning to the second page of Exhibit 2 we note that Miller, whose testimony we have in the record, and who had previously weighed out the ingredients, loaded the reactor and began the heating process at 10:00 p. m. on May 7, 1956. The reactor was then checked and its contents sampled by Farrar, who so testifies, at 2:00 a. m. and 6:00 a. m. on the next morning. There follow two samplings by Schreiber at 11:00 a. m. and 3 p. m., a sampling by Remick at 5:00 p. m., another sampling by Miller, two by Farrar and then the completion of the run is entirely in the hands of Schreiber. During this period it is indicated that one sampling gave an impossible solids content of 48% of which is not accounted for. Thereafter the solids content appeared to decrease rather abruptly to a final 30.2% rather than to attain a stable level of 35–36% or to drop slightly as had been anticipated. It is then indicated that Schreiber alone cooled, dumped, opened and cleaned the reactor and observed that 400 grams of floc had deposited on the reactor walls. The figures for net yield of polybutadiene and waste on page 1 of Exhibit 2 and a note relative to delivery were said by Winslow to have been entered by Schreiber.

The calculations made and conclusions drawn by his superiors, Winslow and Dunn, are all based on Schreiber's figures. Neither of these witnesses and no other witness states that he observed any of the activities of Schreiber. Maguire has no definite recollection that Schreiber·delivered the product to him.

\* \* \* \* \* \*

The failure of Mann to call as witnesses Schreiber, in particular, and Remick, the operators of the run of Exhibit 2 must result in a finding that no probative weight can be accorded Exhibit 2. \* \* \*

The board also held that delivery to Maguire of the substance prepared in connection with the job ticket had not been proved.

This court has rejected the notion that each individual act in the reduction to practice of a count must be proved in detail by an unbroken chain of corroboration. See Patterson v. Hauck, 341 F.2d 131, 52 CCPA 987, Gianladis v. Kass, 324 F.2d 322, 51 CCPA 753, Hasselstrom v. McKusick, 324 F.2d 1013, 51 CCPA 1008. As we said in the latter case, "the purpose of corroborative evidence is to confirm and to strengthen the testimony of the inventor." The proper approach, we believe, involves a reasoned examination, analysis and evaluation of all the pertinent evidence bearing on the question, to the end that a reasoned determination as to the credibility of the inventor's story may be reached. We have attempted to approach resolution of the present issue in this manner.

After considering all the relevant circumstances in this case, we have concluded that it has been proved that the material produced by the Pilot Plant was in fact polybutadiene, in accordance with the instructions contained in job ticket 01228. The material was prepared by an independent service group within appellant's organization, which group was experienced in filling similar requests. The procedure used to prepare the material appears to have been a well-recognized one. The material was not so exotic or unusual that Maguire, who submitted the job ticket, would have been unreasonable in expecting to receive what he had ordered, viz. polybutadiene latex. Cf. Young v. Bullitt, 233 F.2d 347, 43 CCPA 932.

After receiving the material from the Pilot Plant, Maguire requested an analysis of it from the Analytical Department of the General Laboratories. In answer to a query regarding the purpose of such analytical data, Maguire testified:

\* \* \* A. To help identify the rubber and also as a form of check to see if it was in the rough specifications on which we were working at the time.

Q76. How do you mean "rough specifications"? In what sense? A. Such as the gel and the sol viscosities—

Q77. You mean you would have expected that the rubber would have contained gel? A. Yes. We were working with high gel rubber at the time and, obviously if this did not contain gel we would have been quite suspicious of the material that had been delivered to us. \* \* \*

Q78. I now hand you another sheet, "Analytical Test Sheet", containing some data in approximately the middle portion, and ask if you can identify this (handing document to witness). A. (Examining document) Yes. This is the results of the request which I had sent up on the previous sheet [the job request for the analytical work].

Q79. \* \* \* And what is reported there? A. 98 percent gel, which is what we would roughly expect; a high gel. 22 swelling index, also in the range of what we would have expected.

We think this clearly shows that Maguire believed he was working with polybutadiene, and had every reason so to believe. We note also that there was no cross-examination, nor any evidence pre-

sented, which would tend to negate either his belief or the basis for it.

The notation on job ticket 01228 indicates that Schreiber delivered the material produced in accordance with the job ticket to the planner, Maguire. The board's holding that such delivery had not been proved was apparently based on the facts that Schreiber had not been called to give testimony and that Maguire had no positive recollection of receiving the material from Schreiber personally.

While it would have been very desirable to have had testimony from Schreiber, or at least a showing that he was unable to testify, we do not think the lack of such testimony or showing is conclusive that delivery was not made. The record as a whole supports the conclusion that Maguire did in fact receive from the Pilot Plant the material prepared in accordance with job ticket 01228. As Maguire testified:

Q64. Now, referring to the second page of Mann Exhibit 2 for identification: On the righthand side there is a notation and a date and the initials "ES". What does this mean? A. (Examining document) The date is when the latex was delivered to me, and by "ES", who was Ed Schreiber.

Q65. Do you know whether Mr. Schreiber [is] still in the employ of U. S. Rubber? A. No, he is not.

Q66. You say at this time you had a number of requests being processed between your group and Chem Engineering? A. Yes.

Q67. Do you specifically recall Ed Schreiber delivering this particular latex to you? A. No, I am sure I don't.

Q68. Do you have any reason to believe that this entry, "Delivered to planner 5–9–56 ES", appearing on the second page of Mann Exhibit 2, would be anything other than a correct statement? A. No, I haven't got no reason to believe that.

We think this testimony shows that Maguire got the material from *someone*, and after six years was simply unable to remember the details of that particular delivery. And there is nothing in the record which provides the slightest suggestion that the delivery was made by anyone other than Schreiber.

Moreover, the record establishes that the delivery of materials from the Pilot Plant in accordance with requests from other departments was a routine procedure. As pointed out previously, Winslow, who supervised the preparation of the material in accordance with job ticket 01228, stated that it was "very standard procedure" and that he had no reason to believe "that Schreiber had not, in fact, delivered the latex." Mann also testified regarding the well-established delivery procedure:

Q115. I will ask you merely to tell us, based on your experience with Chem Engineering, with initiating job ticket requests, what the ordinary practice would have been in returning this finished polybutadiene to the planner. A. One of the operators would carry the latex in a can from the Pilot Plant to the main laboratory building. He would probably send it up—we were on the third floor—send it to the third floor on the dumbwaiter. If he were coming to the third floor himself he would take it off the dumbwaiter and give it to Maguire. If he were not, he would call Maguire and tell him his latex was available.

In the Hasselstrom case, supra, we considered a similar problem involving corroboration of proof of delivery of a substance. There we said, 324 F.2d at 1018, 51 CCPA at 1014:

The board found that Degering returned the irradiated bags to Henry [one of the co-inventors] who then gave them to Murr, and therefore Henry's intervention breaks the chain of corroboration. However, in our opinion the basic question is not so much to whom Degering returned the irradiated bags, but whether the evidence establishes that the solutions of ammonium acetate which

**642**

Murr analyzed were the same solutions which Degering irradiated. We think the evidence fairly supports the conclusion that the irradiated solutions and the analyzed solutions were the same.

Similar reasoning applies in the present case. We think the record establishes by a preponderance of the evidence that the polybutadiene prepared by the Pilot Plant in accordance with job ticket 01228 was actually delivered to Maguire and used by him in making the compositions of the counts.

The essence of the present case was properly summarized by the dissenting board member in Interference No. 91,206:

Notwithstanding that the transfer of the particular batch of material, to which Exhibit 2 relates, from the Chemical Engineering department employees under Dunn to Maguire has not been proven by proper direct evidence because of the failure of the party Mann to call Schreiber who purportly [sic] delivered the batch, and the failure of Maguire to recall the particular transfer by pure memory, it is evident from the testimony that Maguire believed he was using polybutadiene when he prepared the eight gum plastic compounds to which Exhibit 6 relates.

\* \* \* \* \* \*

\* \* \* A rule of reasonableness must be applied. Maguire ordered polybutadiene by name and by a specified process, from a division (not under the control of Mann) of the company that was "essentially doing a service job, preparing polymers for different departments in the Research Center" according to its head, Walter R. Dunn, who further testified that the group "started to do polymerization work at that time" "about 1942" on "butadiene, styrene, G.R.S. development." Maguire had, in my opinion, about as reasonable an expectation of getting polybutadiene latex on his order to

this department as if he had ordered the preparation done by Firestone or some other rubber company. Before using the latex that went into the P–208 compositions Maguire had some tests made to assure himself that it had the per cent gel and the swelling index and viscosity in benzene that he expected and desired. \* \* \* In my view considering the whole record, the evidence adduced in behalf of the party Mann provides under the burden of proof by a mere preponderance of evidence a reasonable prima facie case on the use of polybutadiene to prepare the eight gum plastics alluded to. \* \* \*

The appealed decisions are accordingly reversed.

Reversed.