John H. COLEMAN, Appellant,

v.

Martin B. DINES, et al., Appellees.

Appeal No. 84–1121.
Interference No. 100,492.

United States Court of Appeals,
Federal Circuit.

Feb. 8, 1985.

Michael G. Berkman, Kegan, Kegan & Berkman, Chicago, Ill., for appellants.

Martha P. Mandel, Evanston, Ill., of counsel.

Richard R. Trexler, Trexler, Bushnell & Wolters, Ltd., Chicago, Ill., of counsel.

Arnold H. Krumholz, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, N.J., for appellees.

Before DAVIS, BALDWIN and KASHIWA, Circuit Judges.

DAVIS, Circuit Judge.

This appeal is from the judgment of the Patent and Trademark Office (PTO) Board of Patent Interferences (Board), Interference No. 100,492, awarding priority of the count to the junior party Dines, and others (Dines). We affirm.

## I. *The Interference*

The subject matter of the interference is directed to a method of separating isotopes of an element. Prior to the current applications, those skilled in the art had tried to take advantage of the fact that the absorption spectra of atoms of an element exhibit an isotopic shift, and that it should be possible to excite isotopes of those elements with light of a selected wavelength. However, production of these light sources was not economically feasible, the atoms were not attainable in the vapor phase, and the shift exhibited overlapping bands. In addition, excitation was difficult, if not impossible, without the required volatility and vibrational characteristics existing in a compound. The current applications relate to a volatile uranyl compound which is useful in such a separation process, seemingly overcomes these obstacles, and meets the desired parameters.

As the Board pointed out, it is the selection and discovery of compounds having the necessary combination of volatility and vibrational sensitivities which is the "essence of the invention." The sole count (Count 1) (suggested by the examiner) defines the subject matter of the invention, and was inserted as each party's claim 1. It reads:

A process for the separation of isotopes of an element, said process comprising vaporizing a volatile uranyl compound, said compound having isotopically shifted infrared absorption spectrum associated with said element, and irradiating said volatile uranyl compound with infrared radiation which is preferentially absorbed by a molecular vibration of molecules of said volatile uranyl compound containing a predetermined isotope of said element so as to provide excited molecules of said compound enriched in said molecules of said compound containing said predetermined isotope, enabling separation of said excited molecules.

This interference was initially declared between the joint application of Coleman and Marks, Serial No. 906,615 ('615), and the Dines application, Serial No. 865,963 ('963). Coleman and Marks were accorded the benefit of a constructive reduction to practice on March 22, 1976 (the filing date of an earlier joint application, Serial No. 668,829 ('829), which issued as Patent No. 4,097,384). Dines (including a number of

coinventors) was given the benefit of a constructive reduction to practice on June 17, 1976 (the filing date of an earlier grandparent application). Accordingly, Coleman and Marks were afforded senior party status, and Dines junior party status.

In a motion under 37 C.F.R. § 1.231, Coleman and Marks moved to substitute the sole application of Coleman, Serial No. 219,362 ('362) (filed on December 22, 1980 as a divisional of the '615 application) for the '615 joint application.[1] This motion was granted and the interference redeclared. Coleman was then accorded the benefit of the '829 application, and therefore is the senior party in the present interference based on an effective filing date of March 22, 1976.

## II. *The Parties' Alleged Conception Dates*

Coleman's conception allegedly dates back to the early 1970's. On December 11, 1973 a colleague of Coleman wrote to the Chairman of W.R. Grace & Co. about Coleman's work with high powered $CO_2$ lasers. On December 18, 1973 Coleman himself wrote to Mr. Fred Kovac of Goodyear Tire & Rubber Co., referring to the use of lasers in uranium isotope separation.

In 1975, Coleman contacted Tobin J. Marks, Professor of Chemistry at Northwestern University. The result was a joint endeavor and a detailed proposal presented to the Energy Research and Development Administration (ERDA) of the federal government on June 25, 1975. Appellant Coleman concedes in his brief that the "material in this memorandum was developed and formalized by Marks, and by Coleman, and by Eric Weitz (Professor of Chemistry at Northwestern University and an associate of Marks')."[2] The ERDA proposal disclosed specific chemical classes and particular compounds for use in laser isotope separation. Volatility and vibrational charac-

teristics were cited as the most important properties of these compounds.

The activities of Dines, together with his coinventors, can be traced back to 1975. Kramer, one of the coinventors, testified before the Board that in March 1975, he and Dines discussed isotope separation with Pete Lucchesi of Exxon Corporation. Lucchesi asked Kramer to conduct a study of the possibilities of obtaining uranium compounds for use with a $CO_2$ laser in isotope separation. The result was a document dated May 22, 1975, entitled "VOLATILE URANIUM COMPOUNDS FOR LASER ISOTOPE SEPARATIONS," which summarized Kramer's and Dines' thoughts on how to make suitable compounds. Kramer stated that they subsequently attempted to obtain financing, until August 1975 when Lucchesi decided to support the program in-house. They then began a formal search for uranium compounds. These efforts continued through November 1975 when newcomer Richard Hall, one of the coinventors, began research into the relationship between the chemical compositions of these compounds and their volatility. In a December 1975 memo, the uranium compound $UO_2(hfacac)_2 \cdot$ tetrahydrofuran was determined to have the properties necessary for use with a $CO_2$ laser in isotope separation.

## III. *The Board's Findings*

The Board decided that Coleman failed to present sufficient facts to establish that there was an "error" cognizable under 35 U.S.C. § 116[3] in the original designation of joint inventorship in the '615 application (Coleman and Marks). The Board said that that lack of "error" was further supported by an overlap of subject matter which existed between Coleman's copending applications, and thus it was improper to assert different inventorship (Coleman *and* Marks for the '615 application, and Coleman for

---

1. Both the '615 joint and sole '362 applications are assigned to Northwestern University and Plasma Physics Corp.

2. Coleman's name is conspicuously absent from the signatory "principal investigators" on the title page of the ERDA proposal.

3. For the text of 35 U.S.C. § 116, *see* Part IV, *infra.*

the '362 application) for indivisible subject matter. The result was that Coleman was held not entitled to the earlier filing date accorded the joint application because he could not adequately prove he was the "same inventor" under 35 U.S.C. § 120 (*see* Part IV, *infra*). Since Coleman was not entitled to the benefit of the joint application, he was limited to the filing date of the '362 divisional (December 22, 1980) for a constructive reduction to practice.

The Board went on to find that Coleman did not prove conception in the 1973 letters: there was no reason to conclude in looking at these letters that a $CO_2$ laser or the use of volatile uranyl compounds was ever intended. The Board did find that the 1975 ERDA proposal disclosed the invention in issue. However, testimony failed to establish that Coleman *himself* suggested using volatile uranyl compounds with a $CO_2$ laser at that time, and therefore the ERDA proposal did not establish Coleman's own conception. Dines, on the other hand, proved conception (according to the Board) prior to March 22, 1976 (Coleman's earliest possible filing date) and diligence until their constructive reduction to practice on June 17, 1976 (Dines' filing date). Since Hall, one of the coinventors, had not arrived to begin his work until November 1975, the Board noted that Dines' earliest possible conception was in their December 1975 memo.

### IV. *Coleman's Alleged Benefit of an Earlier Filing Date*

■ In considering the correctness of the Board's decision, we note that any underlying facts found by the Board must be reviewed under the clearly erroneous standard. *In re Anderson*, 743 F.2d 1578, 1580, 223 USPQ 378, 380 (Fed.Cir.1984). *See also Stock Pot Restaurant, Inc. v. Stockpot, Inc.*, 737 F.2d 1576, 1578, 222 USPQ 665, 666 (Fed.Cir.1984). Here, the

Board found that Coleman had "not presented facts sufficient to show that there was an error in inventorship with respect to the pertinent subject matter disclosed in the joint application." Accordingly, Coleman was held not entitled to the benefit of the earlier filed joint application under 35 U.S.C. § 120. At the time, this section provided:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, *by the same inventor* shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application. [Emphasis added].[4]

The Board properly pointed out that the "same inventor" under this section includes an inventorship entity which has been corrected in accordance with the third paragraph of 35 U.S.C. § 116, which provided as follows at the time of Coleman and Marks' conversion of that joint application to an application by Coleman alone:

Whenever a person is joined in an application for patent as joint inventor through *error*, or a joint inventor is not included in an application through *error* and such *error* arose without any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he prescribes. [Emphasis added].[5]

---

4. This section has been recently amended, replacing the phrase "by the same inventor" with "which is filed by an inventor or inventors named in a previously filed application." Patent Law Amendments, Pub.L. No. 98–622, § 104, 98 Stat. 3385 (1984). Because the Board applied the former phrase, we will also refer to the phrase "same inventors."

5. This section was amended on August 27, 1982, and now the third paragraph reads as follows:
   Whenever through error a person is named in an application for patent as the inventor, or through an error an inventor is not named in an application and such error arose without any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he

In an opinion by our predecessor court, a sole application was granted the benefit of a prior copending joint application after it was shown that there was "error" which occurred in the original designation of joint inventorship. *In re Schmidt*, 293 F.2d 274, 48 CCPA 1140, 130 USPQ 404 (1961). The CCPA declared in *Schmidt* that the term "same inventor" in 35 U.S.C. § 120 does not have a literal or narrow technical meaning, and that conversion of inventorship should be liberally allowed where there has been "error."

In *In re Searles*, 422 F.2d 431, 57 CCPA 912, 164 USPQ 623 (1970), the court said that the statute would be satisfied if sufficient evidence to enable a determination regarding the *facts* of error and the lack of deceptive intent were shown. Although *Searles* dealt with nonjoinder (as compared to the misjoinder situation in the current case), the rationale is the same. The Board or fact-finder must look at the evidence in order to ascertain whether conversion should be allowed. *Accord Shelcore, Inc. v. CBS, Inc.*, 220 USPQ 459 (D.N.J.1983) (granting conversion based upon jury findings of error and lack of deceptive intent). Thus, our inquiry in this facet is whether the Board erred in determining whether Coleman has presented sufficient facts to support his asserted "error."

Coleman contends that he clearly recited the pertinent circumstance and events establishing error in the initial naming of Coleman and Marks as the joint inventors. These documents include the affidavits of Coleman, Marks, Coleman and Marks, a declaration of counsel for Coleman, the statement of inventorship of counsel, and the written consent of the assignees. Of this evidence, the Board considered Coleman's, and Coleman and Marks' affidavits most pertinent. In the former, Coleman simply stated, in the most relevant paragraphs:

6. That Affiant made a mistake in having copied the claim corresponding to Count I [sic] into the joint patent application Serial No. 906,615;

7. That the mistake was made through an honest error and without any deceptive intention;

\* \* \* \* \* \*

And in the earlier affidavit by Coleman and Marks, they averred, again in the most relevant paragraphs:

3. That after the subject interference had been declared, and during review of the history of their own conception and the development of their inventions, all preparatory to filing of a Preliminary Statement in accordance with the applicable rules, they first discovered that the invention set forth in Count 1 was a sole invention of one of them, namely John H. Coleman, and not their joint invention;

8. That Affiant Tobin J. Marks, states he is not the inventor of the invention of Count 1 in Interference; that he disclaims the invention of Count 1 as his invention, and that he recognizes and concedes that the invention of Count 1 is the sole invention of John H. Coleman;

\* \* \* \* \* \*

All the other affidavits and declarations are similarly conclusory.

█ Such averments are no more than bare conclusory statements. There are no specific or hard facts, only the naked conclusory allegations of error or mistake. This court recognizes that amendments under § 116 and conversion of inventorship should be liberally allowed. But the PTO "must be assured of the presence of innocent error ... before permitting a substitution of a true inventor's name." H.Rep. No. 542, 97th Cong., 2d Sess. 9, *reprinted in* 1982 U.S.Code Cong. & Ad.News 773 (comments to Pub.L. No. 97–247 amending

prescribes. Patent and Trademark Office—Authorizations, Amendments, and Schedule of Fees Act, Pub.L. No. 97–247, § 6(a), 96 Stat. 320 (1982).

Appellant points out that Pub.L. No. 98–622 (1984) further amended 35 U.S.C. § 116 to clari-

fy that each inventor need not "sign the application," and added a new sentence pointing out when inventors may file jointly. However, these recent changes to this section do not bear on the issues of the instant case.

**358**

35 U.S.C. § 116). There must be some *evidence* to convince the PTO that an error has occurred. Pursuant to Rule 45(b) as it existed at the time of Coleman's conversion, "a *statement of facts* verified by all of the original applicants" (emphasis added) must be supplied. 37 C.F.R. 1.45(b) (1982). The Manual of Patent Examining Procedure § 201.03 suggests further that this required statement "must include at the least, a recital of the circumstances, including the relevant dates, of (1) the misjoinder and (2) the discovery of the misjoinder."

■ In order to ascertain the actual reason and facts for the "error," Dines' attorney extensively cross-examined Coleman during deposition. Counsel attempted to go beyond the affidavits, but ran into a stone-wall. The most relevant portion of counsel's questions and Coleman's "non-answers" read as follows:

Q. After the Interference was declared did you become aware that you were the sole inventor of the subject matter of Count I [sic] of the Interference and that you were not a joint inventor with Tobin Marks?

A. Did I become aware?

Q. Yes.

A. You mean psychologically? What do you mean become aware specifically?

\* \* \* \* \* \*

Q. You have before you a piece of paper which purports to be a joint affidavit of you and someone named Tobin Marks.

A. Yes.

\* \* \* \* \* \*

Q. Now, can you read Paragraph 3?

A. 'That after the subject interference had been declared, and during review of the history of their own conception and the development of their inventions, all preparatory to filing of a Preliminary Statement in accordance with the applicable rules, they first discovered that the invention set forth in Count 1 was a sole invention of one of them, namely, John H. Coleman, and not their joint invention.'

Q. Could you describe the facts which gave rise to that conclusion?

A. What do you mean the facts? What specific facts are you talking about?

Q. The question is what specific facts are you talking about in that affidavit in Paragraph 3?

A. As I understand, the whole subject of the Interference proceedings is to establish the inventor of the Interference count. And that's what we are here to decide, what this thing is all about.

Q. What did you discover?

A. When?

Q. That's referred to in Paragraph 3 of that affidavit.

A. We discovered many, many things. I don't know what you mean.

Q. I mean, what did you discover that led you to the conclusion that Count 1 was your invention and not a joint invention with Tobin Marks?

A. We discovered just what it says.

\* \* \* \* \* \*

Q. I am asking you a question, and the question I am asking is, what facts do you base that statement in the affidavit on?

A. Well, the facts have all been made—are based on the exhibits and the evidence in the proceedings.

Q. What did you discover that you didn't know before you made that determination?

A. We discovered all—it's all part of the exhibits what we discovered.

\* \* \* \* \* \*

Q. In Paragraph 3 it says that something was discovered. Can you tell me when that discovery occurred?

A. I really can't.

\* \* \* \* \* \*

Q. Do you remember anything beyond what is stated in that paragraph?

A. No.

Q. Do you remember whether you were sitting in a room with people when it [the discovery of the error] occurred, whether it happened in a telephone conversation?

A. Other than I was on my alpha meditation level probably.

Q. You don't remember where you physically were, just where your mind was?

A. I was physically in the universe.

\* \* \* \* \* \*

If the self-serving affidavits shed very little light on the reason for the alleged "error", Coleman's refusal at his deposition to provide any real "facts" surely clouds the picture even further. All of the papers filed by Coleman, and his deposition answers, uncover no facts to indicate that any "error" had to be found by the Board. The Board found instead, after considering all this evidence, that appellant had not presented facts sufficient to show "error" in the original designation of Coleman and Marks as the joint inventors for the subject matter of the count. In view of the less-than-skeletal presentation made to it, we cannot say the Board erred in this respect.[6,7]

The Board then correctly pointed out that the filing date of the Coleman and Marks '829 application may not be relied upon because it was not copending with the Coleman '362 application. 35 U.S.C. § 120. Accordingly, because Coleman is not entitled to the benefit of the earlier '615 joint application, he was limited to his filing date of December 22, 1980, for a constructive reduction to practice.

### V. *Coleman's Conception*

■ Although we affirm the Board's finding that Coleman is only entitled to a 1980 filing date for a constructive reduc-

tion to practice, we also find it necessary to address the Board's findings relating to the date of priority.[8] In this interference, Coleman's whole case falls on one of the elements required in proving date priority, date of conception. The CCPA has defined conception of an invention as:

the complete performance of the mental part of the inventive act. All that remains to be accomplished, in order to perfect the act or instrument, belongs to the department of construction, not invention. It is therefore the formation, in the mind of the inventor of *a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice,* that constitutes an available conception, within the patent law.

*Gunter v. Stream,* 573 F.2d 77, 80, 197 USPQ 482, 484, (CCPA 1978) (emphasis in original) (citing *Mergenthaler v. Scudder,* 11 App.D.C. 264, 276, 1897 C.D. 724, 731 (1897)). It is settled that in establishing conception a party must show possession of every feature recited in the count, and that every limitation of the count must have been known to the inventor at the time of the alleged conception. *Davis v. Reddy,* 620 F.2d 885, 889, 205 USPQ 1065, 1069 (CCPA 1980). Conception must be proved by corroborating evidence which shows that the inventor disclosed to others his "completed thought expressed in such clear terms as to enable those skilled in the art" to make the invention. *Field v. Knowles,* 183 F.2d 593, 601, 37 CCPA 1211, 1222, 86 USPQ 373, 379 (1950).

**6.** The Board held also that the statements by Coleman and Marks were insufficient to establish "error" because it could not be ascertained what portions of the joint application were the invention of Coleman and Marks, and what portions were the invention of Coleman alone. *In re Perrin,* 142 F.2d 277, 31 CCPA 1041, 61 USPQ 418 (1944). Because we affirm on the basis that there is a dearth of evidence supporting "error" under § 116, we need not pass on the Board's further inquiry into this lack of distinction between the copending joint and sole applications. We make no determination as to the divisibility of the two applications, or the distinction between Count 1 of the sole application and the claims of the joint application.

**7.** We do not believe, and appellant has failed to convince us otherwise, that the 1984 amendments to §§ 116 and 120 affect the Board's holding. The new statute still requires some facts to support "error," and appellant has presented none.

**8.** It is possible for Coleman still to be awarded priority in this *inter partes* interference proceeding if he were to establish the earlier conception date coupled with diligence until his 1980 filing date. For this reason we consider the section of the Board's opinion in which it addressed date priority in the "interest of completeness."

Coleman asserts that the 1973 letters corroborate his claim to a conception date of late 1973. He argues that in his letter to Kovac on December 18, 1973, he proposed the use of laser energy for uranium isotope separation. In addition, it is claimed that in the December 11, 1973 letter, Coleman's proposed use of a high power $CO_2$ laser is confirmed. Finally, Coleman contends that, under the "rule of reason" used to corroborate conception, uranyls were a well-known major class of uranium compounds in 1973, and that fact (by itself) should be considered adequate corroboration. The Board noted that "[i]n Coleman's view it is inconceivable that Coleman, a scientific man well versed in the art, was not aware of and did not contemplate uranyls as candidates for the process which he had in mind...."

■ This "rule of reason," which was developed over the years in order to ease the requirement of corroboration, usually is applied when establishing actual reduction to practice. *See Mikus v. Wachtel*, 542 F.2d 1157, 191 USPQ 571 (CCPA 1976). Even so, Coleman's attempt to apply the rule to establish conception fails in this present case. The rule suggests a reasoned examination, analysis and evaluation of all pertinent evidence so that a sound determination of the credibility of the inventor's story may be reached. *See Mann v. Werner*, 347 F.2d 636, 52 CCPA 1578, 146 USPQ 199 (CCPA 1965). The rule of reason, however, does not dispense with the requirement for some evidence of independent corroboration. Coleman has not presented any evidence of an independent nature to support his testimony that one of ordinary skill in the art, at the time of his purported conception, would contemplate the use of volatile uranyl compounds. Thus, the Board did not err in ruling that Coleman failed to establish conception in late 1973.

Coleman also attacks the Board's finding that Marks' testimony does not indicate that the use of volatile uranyl compounds set forth in the 1975 ERDA proposal was the invention of Coleman alone. He argues that, in light of the Board's finding that the ERDA proposal discloses the invention and also of the asserted fact that he was one of the authors of that proposal, it is undeniable that he is entitled to a date of conception no later than 1975 (when the ERDA proposal was made).

The fact is that Marks' testimony does not establish that any of the uranyl compounds were suggested by Coleman. Marks testified, rather, that the ideas between the authors were "intermingled." The parties even stipulated that Weitz collaborated in and participated in the preparation of the ERDA proposal. Further, as noted above (note 2, *supra*), Coleman's name or signature is absent from the list of principal investigators on the title page of the proposal.

■ Appellant has pointed us toward no authority standing for the proposition that one who *may* be a *co*-author of a document can be considered the *sole* inventor of any invention disclosed in that document, without some further proof. As was set forth in *Gunter, supra,* it is the formation "in the mind of the inventor," not in the mind of another, that establishes conception. It is insufficient to argue, without offering independent corroboration of the particular source of the invention, that one who attains a definite and permanent idea of the complete and operative invention—after the document is completed—is necessarily the inventor. By just *reading* the ERDA proposal, anyone, including Coleman, could have a "definite and permanent idea." Coleman cites *Van Otteren v. Hafner and Cork*, 278 F.2d 738, 742, 47 CCPA 993, 126 USPQ 151, 154 (Bd.Pt.Int.1950), as support for the proposition that one who was "the spark which lead to the final satisfactory result" is the inventor. The difficulty here is that initial formation in Coleman's mind must be, but was not, firmly established. The evidence did not show that Coleman's "completed thought" was disclosed to others. *See Field v. Knowles, supra.* What was shown here, at best, was that the ideas were "intermingled," and not that Coleman was the "spark."

For that reason we cannot say the Board erred in finding that the ERDA proposal did not establish Coleman's own conception.[9]

 Thus, on the basis of Dines' June 17, 1976 constructive reduction to practice and Coleman's failure to establish conception prior to that date, the Board properly concluded that Dines is entitled to priority.[10]

### VI. Coleman's Request for a Contingent Award of Priority

 Coleman requested at oral argument before the Board, and also before this court, that if the invention is found to be the joint invention of Coleman *and* Marks, priority of invention should be awarded to Coleman and Marks on the basis of the ERDA proposal. Coleman points out that the Board specifically found that the ERDA proposal discloses the invention in issue. As the Board correctly said, however, such a contingent award is inappropriate. It is well-established that the "issue of propriety of joinder is basically the same as the issue of third party inventorship and is not ancillary to priority for similar reasons." *Case v. CPC International, Inc.*, 730 F.2d 745, 749, 221 USPQ 196, 200 (Fed.Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 223, 83 L.Ed.2d 152 (1984).[11] Accordingly, the Board properly refused to consider whether Coleman and Marks, a different inventive entity from Coleman himself, should be awarded priority on the basis of the ERDA proposal.[12]

We therefore affirm the Board's award of priority to Dines, et al.

AFFIRMED.

---

9. In light of this holding, we need not address Dines' contention that the Board erred in finding that the ERDA proposal disclosed the invention in issue.

10. Since Coleman cannot "get behind" Dines' effective filing date, there is no need to discuss appellees' assertion that the Board erred in concluding that Dines failed to prove conception prior to June 1975.

11. The Board has jurisdiction to decide questions of priority and questions which are "ancillary to priority." *Myers v. Feigelman,* 455 F.2d 596, 59 CCPA 834, 172 USPQ 580 (1972).

12. The Board found that, although the ERDA proposal disclosed the invention, it did not necessarily prove conception by Coleman and Marks. Because of the need for independent corroboration, proof of conception by joint inventors is not the same as proof required of a sole inventor. In the instant interference, in which Coleman alone is urged as the inventor, the ERDA proposal cannot be used as a basis for conception by Coleman *and* Marks. We make no determination of an award of priority if a new interference were declared between Coleman *and* Marks and Dines, a possibility the Board pointed out in its closing footnote.