APPLIED MEDICAL RESOURCES
CORPORATION, Plaintiff,

v.

UNITED STATES SURGICAL
CORPORATION,
Defendant.

No. 1:96CV1217.

United States District Court,
E.D. Virginia,
Alexandria Division.

June 17, 1997.

John P. Corrado, Kathryn Marrone, Hazel & Thomas, P.C., Alexandria, VA (Stephen C. Neal, Scott D. Devereaux, Michelle G. Galloway, Cooley Godward L.L.P., Palo Alto, CA, of counsel), for Plaintiff.

Gregory L. Murphy, F. Allen Phaup, II, Murphy Morris & Mitchell, P.C., Alexandria, VA (Harvey Kurzweil, Clark E. Walter, Lawrence Brocchini, Dewey Ballantine, New York City, of counsel), for Defendant.

ELLIS, District Judge.

### MEMORANDUM OPINION

This patent infringement suit involves four patents, three of which the plaintiff asserts against the defendant and the fourth which the counterclaiming defendant asserts against the plaintiff. The motion at bar concerns the patent asserted in the counterclaim, namely U.S. Patent No. 4,931,042 (the "042 patent"). Specifically, the matter before the Court is defendant's motion, pursuant to 35 U.S.C. § 256, to correct the inventorship of the 042 patent by adding the name of a previously omitted third inventor. For the reasons that follow, the motion must be granted.

### I.

This is an unusual tale of multiple inventorship. The *dramatis personae* consists of four patents, four companies and three individuals. Plaintiff, Applied Medical Resources Corporation ("Applied"), is a California company engaged in the business of making and selling medical devices. Applied is the owner of the three patents alleged in the complaint to be infringed by defendant, namely U.S. Patent Nos. 5,209,737, 5,308,336 and 5,385,533.

Defendant, United States Surgical Corporation ("Surgical"), is a New York corporation also engaged in the manufacture and sale of certain medical devices. It was first the exclusive licensee, and is now the owner of, the 042 patent. It is also the owner of two additional patents, U.S. Patent Nos. 4,902,280 (the "280 Patent") and 5,030,206, (the "206 patent") that it initially alleged in counterclaims were infringed by Applied. Those counterclaims have been withdrawn by stipulation pursuant to Rule 41, Fed.R.Civ.P.

EndoTherapeutics Corporation ("Endo") is a California company engaged in development of a line of single-use precision instruments for endoscopic surgical procedures. In 1992, Endo became Surgical's wholly owned subsidiary.

The fourth company is a Massachusetts consulting firm owned by, and consisting of, two of the principal players in this tale, William Holmes and Peter Costa, the named co-inventors of the 042 patent. Holmes and Costa worked as consultants for Endo in the effort to develop new product designs. The third and final individual player in the drama is Jack Lander, a former Surgical employee and, by Surgical's lights, the unnamed inventor of the 042 patent.[1] Lander is also the named inventor of Surgical's 206 and 280 patents, patents Applied was initially accused of infringing.

The four patents in this suit all relate to certain aspects of trocars, which, in general, are devices used in surgical procedures to establish an entry passage into the body for diagnostic or surgical purposes. More particularly, the trocars at issue combine a cannula, through which surgical instruments can pass, with an obturator, a sharp-pointed rod that can puncture the wall of the body cavity. These trocars are used to facilitate surgical techniques, such as laparoscopy, that enable surgeons to examine and operate within a body cavity, typically the abdomen, with minimally invasive impact on the patient. Applied's three patents relate to trocar seal

---

1. Lander was employed as a product designer for Surgical from September 1984 through June 1987. He is currently employed by Wentworth Laboratories of Danbury, Connecticut as a project engineer.

technology,[2] while Surgical's 042 patent relates to locking or latching mechanisms for an obturator's protective shield.

In November 1985, Surgical and Endo, which were then unrelated entities, entered into a Joint Research and Development Confidential Disclosure Agreement ("the CDA") for the purpose of sharing confidential information about products in development. The CDA was designed to enable the parties to explore cooperative development of medical devices to be used with certain of Endo's endoscopic devices.

It also appears that the parties' ultimate goal was the licensing to Surgical of both jointly developed products and products developed by Endo. To this end, the parties executed a License Agreement in June 1986, pursuant to which, *inter alia*, Endo granted Surgical an exclusive worldwide license to practice Endo's trocar related inventions and developments. The scope of the license encompasses patented inventions and unpatented know-how. Included among the License Agreement's terms was a provision requiring Surgical to pay Endo $100,000 for Endo's existing engineering drawings, tooling and component parts relating to trocars. This was done so that Surgical would be entitled to manufacture the licensed products, since Endo planned to cease its trocar manufacturing after the execution of the License Agreement. Apart from an initial payment, the License Agreement provides for Surgical to pay royalties for different terms depending on whether a product is covered by U.S. Patents. For products not covered by U.S. patents, the royalty period is twelve years. For products covered by U.S. patents, the royalty period extends until the last to expire of the applicable U.S. patents. At the time the parties entered into the License Agreement, the parties apparently contemplated that the second royalty period would apply to

trocar products, as Endo, by then, had already applied for two patents covering its trocar technology, both of which issued not long after the License Agreement was executed.[3]

The story of the inventorship of the 042 patent begins in 1985, prior to the CDA and the License Agreement, when Holmes and Costa, working as consultants for Endo, conceived of a locking or latching device for a trocar. In a trocar, an obturator is used to pierce the body wall and thereby create an entry point for the cannula. This obturator consists of a rod with a sharp-pointed tip at one end. When the tip is not in use, it is covered by a safety shield to prevent inadvertent puncturing of the body cavity. Holmes and Costa used interacting camming surfaces to create a mechanism that locks the safety shield over the tip of the obturator when the tip is not in use, yet also allows the surgeon to retract the safety shield and use the sharp trocar tip when necessary.

By the end of 1985, a number of drawings and at least one model or prototype had been developed reflecting Holmes' and Costa's concept. Then, in early 1986, these drawings and prototype were disclosed to Surgical pursuant to the CDA.[4] At Surgical, Lander, then a product designer there, reviewed these drawings and prototype without knowing that Holmes and Costa were the originators of the technology disclosed. Concluding that the Holmes and Costa device was not adequate in certain respects, Lander in April 1986 conceived and reduced to practice an alternative locking mechanism. Lander's locking mechanism, unlike the Holmes and Costa embodiment, employs a metal leaf spring as a means for controlling the safety shield's movement. Surgical, as the assignee of Lander's rights to this invention, applied for and received the 206 patent covering it.

---

2. Surgeon operating on or examining a body cavity such as the abdomen inflates that cavity with gas. This inflation separates the cavity wall from the internal organs, thereby creating space within which cameras and instruments inserted through the cannula can be maneuvered. Seals incorporated in a trocar's cannula and housing permit the insertion and manipulation of instruments in the body cavity without resulting in an unacceptable loss of internal pressure.

3. These patents were issued as U.S. Patent Nos. 4,601,710 and 4,654,030.

4. And, of course, within months Surgical also gained an exclusive license to use this technology pursuant to the Licensing Agreement.

In doing so, it appears that Surgical, like Lander, was unaware of Holmes' and Costa's contribution to this invention and hence did not name them as co-inventors of the 206 patent.

In early 1987, Surgical began to market a trocar product known as the Surgiport®, which embodied Lander's leaf spring mechanism. Later in 1987, Endo decided to seek patent protection for the trocar design developed by Holmes and Costa. At this time, so far as this record discloses, Endo and its consultants, Holmes and Costa, were entirely unaware of Lander's leaf spring locking development and the related Surgical patent application. Thus, in October 1987, when Endo filed the patent application that ultimately ripened into the 042 patent, only Holmes and Costa were listed as the inventors. Yet, this application, as well as the 042 patent itself, disclosed and claimed a trocar that included a leaf spring mechanism. And, it now appears virtually certain that the leaf spring mechanism disclosed in the 042 patent is essentially identical to the mechanism invented by Lander.[5]

As certain as it is that the leaf spring latching mechanism disclosed and claimed in 042 patent came from Lander, it is just as uncertain precisely how this came about. It is undisputed that Holmes & Costa developed a latch mechanism using overlapping cam surfaces, not a leaf spring as invented by Lander. It is also undisputed that neither Holmes and Costa, nor Endo was aware of Lander and his work.

How, then, did Lander's leaf spring mechanism find its way into the 042 patent? Surgical contends this occurred when, in 1987, Surgical's Surgiport® trocar was marketed generally and samples almost certainly came into Endo's possession. From this essentially uncontroversial fact, Surgical contends that it is appropriate to infer that Endo's patent lawyer merely incorporated the leaf spring latch into the 042 patent application mistakenly believing that it was an embodiment of the Holmes and Costa invention. For their part, Holmes and Costa testified that they recognized that the leaf spring mechanism represented in the 042 patent figures was not their exact design, but they believed it represented "the patent illustrator's interpretation" of their design and "an implementation" of their work. After several years of prosecution, the 042 patent issued on June 5, 1990.

## II.

A patent must be filed in the name of all of its inventors. See 35 U.S.C. §§ 111, 116; Stark v. Advanced Magnetics, Inc., 29 F.3d 1570, 1573 (Fed.Cir.1994); Jamesbury Corp. v. United States, 207 Ct.Cl. 516, 518 F.2d 1384, 1395 (1975). Thus, a patent is invalid if all true inventors are not named. Accordingly, Applied contends that the 042 patent is invalid, given that Holmes and Costa were not the inventors of an element of that patent's claims, namely the leaf spring latching mechanism.

Given the admission of Holmes and Costa regarding their unfamiliarity with the leaf spring, it appears that the 042 patent does not name every true inventor of that patent's claims. Nonetheless, the 042 patent is not necessarily invalid. This is so because in limited circumstances the Patent Act permits the correction of non-fraudulent errors of inventorship in issued patents, see 35 U.S.C. § 256,[6] thus "[serving] the public policy of

---

**5.** This is established by the careful analysis of Surgical's expert, Martin Schecht, an MIT engineering professor. By affidavit, Professor Schecht provides persuasive evidence for his conclusion that Lander contributed the leaf spring latch configuration to the trocar invention disclosed and claimed in the 042 patent.

**6.** Section 256 provides that:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commission-

er may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly.

35 U.S.C. § 256.

preserving property rights from avoidable forfeiture." *Stark,* 29 F.3d at 1573 (citing *Henderson v. Carbondale Coal & Coke Co.,* 140 U.S. 25, 11 S.Ct. 691, 35 L.Ed. 332 (1891)). The Federal Circuit has explained:

> [b]efore the enactment of § 256, incorrect inventorship of an issued patent would simply invalidate the patent. The purpose of § 256 was to provide a remedy for a bona fide mistake in inventorship.

*Stark,* 29 F.3d at 1573. Accordingly, in the instant motion Surgical seeks to correct inventorship of the 042 patent by adding Lander as a named inventor, pursuant to § 256.

■ Section 256 correction is liberally allowed, provided that the inventorship error occurred without deceptive intent. *See Coleman v. Dines,* 754 F.2d 353 (Fed.Cir.1985). Yet, an issued patent is presumed valid, pursuant to 35 U.S.C. § 282, and this presumption extends to the patent's statement of inventorship. *See Ethicon, Inc. v. United States Surgical Corp.,* 937 F.Supp. 1015, 1034 (D.Conn.1996). Accordingly, the party seeking to correct inventorship by adding an inventor must prove by clear and convincing evidence (i) that the omitted person was a joint inventor; (ii) that the omission was the result of error; and (iii) that the omission was without deceptive intent. See 35 U.S.C. § 256. In the facts of this case, then, Surgical must prove by clear and convincing evidence (i) that Lander was a true joint inventor of the 042 patent, (ii) that Lander was omitted from the patent by error, and (iii) that the omission was without deceptive intent.

### 1. *Lander was an Inventor*

■ The expert testimony of Dr. Martin Schecht, an engineering professor at MIT,

provides clear and convincing evidence that the leaf spring mechanism disclosed in the 042 patent is essentially identical to the mechanism invented by Lander in 1986. Professor Schecht's affidavit reflects a meticulous and thorough comparison of the leaf spring latch configurations disclosed in both Lander's laboratory notebook and the 206 patent on one hand, with the leaf spring latch disclosed in the 042 patent on the other. The comparison convincingly demonstrates that the two latches are the same. As a result, Professor Schecht concludes that Lander contributed the leaf spring latch configuration to the trocar invention disclosed and claimed in the 042 patent. This testimony is convincing evidence that Lander is a joint inventor of the 042 patent.

### 2. *The Omission was an Error*

■ Although correction pursuant to § 256 is limited by the language of that section to "errors", the statute itself provides no definition of "error", nor have courts construed the term in this context. "Error" is defined by Webster's, in relevant part, as "an act involving an unintentional deviation from truth or accuracy" and "an act that through ignorance, deficiency, or accident departs from or fails to achieve what should be done." See Webster's Third International Dictionary Unabridged, at 772 (1993). Thus, the term appears to cover both unintended results and deliberate choices made on the basis of erroneous information.[7]

■ This definition, applied here, points persuasively to the conclusion that the omission of Lander was erroneous. Specifically, while Holmes and Costa deliberately chose to name only themselves on the 042 patent, they made that decision through ignorance, as

---

7. This definition of "error" is consistent with the Federal Circuit's interpretation of that term elsewhere in the Patent Act. For example, § 251 authorizes the correction of a patent through reissue if that patent contains "error" without "deceptive intent". In that section, as here, "error" is not defined, but courts have interpreted the term to cover instances of "inadvertence, accident, or mistake". *See Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 882 F.2d 1556, 1565 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990) (*quoting Ball Corp. v. United States,* 729 F.2d 1429, 1435 & n. 9 (Fed.Cir.1984)). More specifically, in the § 251 context the Federal Circuit has delimited the scope of "error" to include both unintended results, such as a defective drawing, and deliberate decisions based on deficient information, such as where a patent attorney fails to understand the scope of the claimed invention. *See, e.g., In re Amos,* 953 F.2d 613, 616 (Fed.Cir. 1991); *Hester Industries, Inc. v. Stein, Inc.,* 963 F.Supp. 1403 (E.D.Va.1997). Thus, the Federal Circuit's interpretation of "error" elsewhere in the Patent Act is consistent with the definition of that term adopted here for the purposes of § 256.

neither Holmes nor Costa were aware of Lander's contribution. In omitting Lander from the 042 patent, Holmes and Costa, through "ignorance, deficiency, or accident", "failed to achieve what should have been done", namely, the identification of Lander as a joint inventor. Thus, the omission of Lander is an "error", as that term is used in § 256.

This conclusion is not inconsistent with the named inventors' admission that they were aware that the leaf spring mechanism was not their exact design. The undisputed record reflects that Holmes and Costa considered the leaf spring mechanism depicted by the patent illustrator in the 042 patent application to be a permissible interpretation or embodiment of their invention. They were neither aware of Lander's contribution, nor aware of claims in the patent application that they considered beyond the scope of their claimed invention. Holmes and Costa mistakenly and erroneously omitted a joint inventor from the 042 patent. This "error", if made without deceptive intent, is amenable to § 256 correction.

### 3. *The omission Did Not Result from Deceptive Intent*

■ Section 256 allows the correction of a patent only where an inventorship error arises without "deceptive intention". With respect to this issue, there is a threshold question of whose "intent" is relevant—the omitted inventor's intention or the named inventors' intention. The language of § 256 provides that an inventor not named in an issued patent may seek correction where "such error arose without any deceptive intention **on his part**." (emphasis added). Notwithstanding this language, which suggests that it is the omitted inventor's intention that counts, district courts construing § 256 have uniformly and sensibly required the absence of deceptive intent on the part of **any** true inventor, omitted or named. *See, e.g., Stark v. Advanced Magnetics, Inc.,* 894 F.Supp. 555, 560 (D.Mass.1995); *University*

*of Colorado Foundation, Inc. v. American Cyanamid,* 880 F.Supp. 1387, 1399 (D.Colo. 1995). This result is based on the conclusion that § 256 is limited to the correction of innocent errors, not deception, and thus both the applicant for correction and the actual inventor must be innocent of fraud. *See Stark,* 894 F.Supp. at 559.[8] In any event, this threshold question is immaterial here given the conclusion that the omission of Lander was without deceptive intent on the part of any of the true inventors.

The "deceptive intention" language limits § 256 correction to innocent errors in the nonjoinder or misjoinder of inventors. *See, e.g., McMurray v. Harwood,* 870 F.Supp. 917, 919–20 (E.D.Wis.1994). Accordingly,

> [t]he statute cannot be used as a vehicle for substituting inventors to rectify conspiracy and fraud in the application, and it does not authorize the correction of grossly negligent mistakes, made by parties having full notice of the facts and their legal significance, or deliberate mistakes attributable to errors of judgment.

60 Am.Jur.2d *Patents* § 857 (1987) (citations omitted). These principles, applied here, compel the conclusion that Lander was omitted from the 042 patent without deceptive intention. While no party involved in the patent application that led to the 042 patent recalls precisely how the leaf spring mechanism came to be incorporated into the 042 patent application, the record reflects that Lander's contribution of this element was unknown. Holmes and Costa believed that the leaf spring was an embodiment of their invention, a mere interpretation of their claims by the patent illustrator. Further, Thomas Ciotti, the patent attorney responsible for the prosecution of the 042 patent, declares by affidavit that while he cannot recall the specifics of the preparation of the 042 patent application, neither he nor any attorneys in his supervision intended to deceive the Patent and Trademark Office by incorrectly identifying the inventors of the

---

8. In *Stark,* the district court certified this threshold question, namely, whether an innocent omitted inventor may seek correction if the named inventors acted with deceptive intent, for appeal pursuant to 28 U.S.C. § 1292(b). *Stark,* 894 F.Supp. at 560. Permission to appeal has been granted by the Federal Circuit, but the question has not yet been resolved. *See Stark v. Advanced Magnetics, Inc.,* 79 F.3d 1165 (Fed.Cir.1996)(TABLE).

042 patent. Finally, in light of the Licensing Agreement, there is no persuasive evidence in the record that Holmes and Costa, Lander, Endo, or Surgical would have any motive to deceive the Patent Office by omitting Lander from the 042 patent.

Applied contends that there were factors that provided possible motivation for the omission of Lander from the 042 patent. This contention is unpersuasive. The relationship between, Holmes, Costa, Endo, Lander and Surgical negated any motivation that Holmes and Costa might have had to omit Lander from the 042 patent. And the only relevant record evidence points persuasively to the conclusion that the omission of Lander resulted from ignorance of his contribution to the 042 patent application among the parties prosecuting the 042 patent.

Applied further contends that Surgical's inability to identify how Lander's contribution was incorporated into the 042 patent is fatal to § 256 correction in light of Surgical's clear and convincing burden. This too is unpersuasive. Where, as here, the named inventors are ignorant of the contributions of an omitted inventor, the record might often be silent on the precise events leading to the incorporation of the omitted inventor's ideas. In other words, where inventors are aware of a contribution and choose not to name the contributor on the patent, the reasons and intent in that decision will likely be documented or recalled. But where an unnamed inventor's contribution is unknown to those involved in the patent application process, the decision to omit the unknown inventor will not be reflected in the record because no such decision was ever made; the error is one of knowledge, not judgment. In these circumstances, the failure to identify precisely how Lander's contribution came to be included in the 042 patent without proper inventorship attribution is not fatal to § 256 correction. To the contrary, in the facts of this case, the testimony of the participants in the 042 patent prosecution, combined with an absence of any motive on anyone's part to omit Lander from the 042 patent, provides clear and convincing evidence that Lander's omission as a named inventor was without "deceptive intention."

In sum, Surgical has established by clear and convincing evidence that Lander was a true inventor of the 042 patent, that his omission from that patent was an error, and that this error arose without deceptive intention on the part of Lander or the named inventors. As a result, a § 256 correction is appropriate.

### III.

In the alternative, Applied contends that Surgical should be barred from correcting the inventorship of the 042 patent for equitable reasons, given that Surgical has known for more than five years about the nonjoinder of Lander on the 042 patent application and only moves now to correct the patent.

■ Although § 256 correction is liberally allowed to prevent avoidable forfeiture of property rights, "equity disfavors undue and prejudicial delay by a person who may have an interest in the property of another." *See Stark*, 29 F.3d at 1573. Thus, laches and estoppel have been applied to prevent a correction of inventorship where a movant has failed to correct a known error in a patent, and that failure has prejudiced the rights of another. *Id.; Advanced Cardiovascular v. SciMed Life Systems, Inc.*, 988 F.2d 1157, 1163 (Fed.Cir.1993). Yet, there is no time limit for a § 256 correction, nor is there any statutory or regulatory requirement of diligence in seeking such a correction. *Stark*, 29 F.3d at 1575. Thus, the Federal Circuit has concluded that "[w]hether diligent action is required in a particular case must be determined on the facts of that case." *Id.*

■ The facts of this case do not warrant barring § 256 correction of the 042 patent on the basis of laches or estoppel. Such equitable defenses require the dismissal of a claim where there is (i) "unreasonable and unexcused delay in bringing a claim," and (ii) "material prejudice to the defendant as a result of the delay." *Advanced Cardiovascular*, 988 F.2d at 1161. In the facts of this case, neither Applied nor Holmes and Costa can legitimately assert material prejudice as a result of delay in bringing the motion to correct inventorship of the 042 patent.

Holmes and Costa assigned all of their rights in the 042 patent to Endo. Endo, in turn, not only executed a Licensing Agree-

ment in 1986 with Surgical with respect to Endo's trocar technology, but thereafter, in 1992, Endo was acquired by Surgical. And with respect to the leaf spring, Lander, a former employee of Surgical and the inventor of the leaf spring, assigned his rights in the latch mechanism to Surgical. Thus, Surgical, the movant, is the only party with a property interest in the 042 patent, and neither Endo nor Holmes and Costa have experienced any prejudice from Surgical's delay in seeking correction of the 042 patent. Moreover, Applied does not indicate any reliance it placed on the accuracy of the named inventors in the 042 patent. Thus, Applied cannot establish any material prejudice it has suffered as a result of Surgical's delay in seeking § 256 correction. It follows that Applied cannot successfully invoke the equitable defenses of laches or estoppel in the facts of this case.

In sum, Surgical has established by clear and convincing evidence that Lander was a true inventor omitted from the 042 patent as a result of error without deceptive intention. And a § 256 correction is not barred by the equitable principles of laches or estoppel. Accordingly, Surgical's motion for correction of the 042 patent to name Lander as a joint inventor must be, and hereby is, granted.

An appropriate Order has issued.