**IMX, INC., d/b/a Global Netoptex, Inc., Plaintiff,**

v.

**E–LOAN, INC., and Banco Popular North America, Inc., Defendant.**

**Case No. 09–20965–CIV.**

United States District Court, S.D. Florida, Miami Division.

April 21, 2010.

Edward Maurice Mullins, Annette Cristina Escobar, Astigarraga Davis Mullins & Grossman, Miami, FL, Erik R. Fuehrer, M. Elizabeth Day, Marc C. Belloli, William G. Goldman, DLA Piper U.S. LLP, East Palo Alto, CA, John Allcock, Stanley J. Panikowski, DLA Piper LLP, San Diego, CA, Michael R. Casey, Davidson Berquist Jackson & Gowdey LLP, Arlington, VA, for Plaintiff.

Christina Danielle DeAngelis, James Anthony Gale, Samuel Abraham Lewis, Rafael A. Perez–Pineiro, Feldman Gale PA, Miami, FL, for Defendant.

---

## ORDER ON CLAIM CONSTRUCTION

JOSE E. MARTINEZ, District Judge.

THIS CAUSE came before the Court for claim construction. The Court has carefully considered extensive briefing by the parties and pertinent portions of the record. The Court also heard argument and received evidence at a hearing held in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) on November 17, 2009.

## I. *INTRODUCTION*

According to the allegations in the Complaint, Defendant, E–Loan, Inc., infringed United States Patent Number 5,995,947 (the "'947 Patent"), which is held by Plaintiff, IMX, Inc.[1] In the sections titled "Background of the Invention" and "Summary of the Invention," the '947 Patent is described as a method and system designed to address the inefficiencies inherent in organizing and disseminating "a relatively large amount of information [that] must be exchanged to conduct a loan transaction" by hand, and instead, to "provide a method and system for automating loan transactions" by using, among other things, a computer network and database. '947 Patent, Col. 1–2. Because it is crucial to the claim construction analysis, the undersigned notes at the outset that the parties' dispute over the appropriate claim construction is largely a function of their divergent views of the scope of the '947 Patent, as it relates to curing the expense and ineffectiveness of processing loan applications by hand.

E–Loan's interpretation emphasizes the portions of the "Background of the Invention" section of the Patent that disclose an invention that places loan applications "up for bid by a plurality of potential lenders, and following those loans using a technique for managing such loan applications and bids." *Id.*, Col. 2:1–4. In other words, according to E–Loan, the '947 Patent is essentially an "electronic stock exchange," which facilitates the trade of loan applications rather than stocks (Deft. Markman Rebuttal ("Deft. M.R.") at 2–3). The common thread running through E–Loan's claim construction arguments is that the '947 Patent discloses a method and system for processing loans through an auction-style arrangement that necessarily involves a collection of potential lenders bidding on loan applications.

IMX's interpretation, in contrast, emphasizes that the '947 Patent as a whole more broadly describes an invention "in which a database server maintains a database of pending loan applications and their statuses; [and where] each party to the loan can search and modify that database consistent with their role in the transaction." *Id.* Col. 2:5–9. Thus, IMX contends that the '947 Patent discloses a method and system that permits borrowers and lenders to maintain and manage loan documents online and that it is not a necessary component of the invention that multiple lenders competitively bid on pending loan applications.

The distinction is significant because E–Loan describes itself as a traditional "bricks and mortar" lending institution that uses the allegedly infringing system only for the purposes of managing applications from its own customers who are specifically seeking to obtain a loan from E–Loan. This is in contrast to services like Lending Tree, for example, which is geared toward matching potential borrowers with one of many competing lending institutions. The Court concludes that MX has the better of this argument since

---

1. Although E–Loan disputes IMX's ownership of the patent, this issue will be addressed in more detail in connection with the parties' cross-motions for summary judgment.

the '947 Patent does not require that the invention be used to allow for trading of loan applications among a plurality of potential lenders, and the claim construction that follows should be viewed in that light.

## II. LEGAL STANDARDS

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995). The second step is determining "whether the accused method or product infringes the asserted claim as properly construed." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581–82 (Fed.Cir.1996). At this stage, the Court is only construing the patent claims for the purpose of determining "what is and is not covered by the technical terms and other words of the claims." *Netword, LLC v. Centraal Corp.* 242 F.3d 1347, 1352 (Fed. Cir.2001). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed.Cir.2004). The words in a claim "are generally given their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir. 2005). However, the ordinary meaning of a term as understood by a person skilled in the art is "often not immediately apparent and because patentees frequently use terms idiosyncratically courts should look to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' " *Id.* at 1314. (quoting

*Innova*, 381 F.3d at 1116). These sources include various forms of intrinsic evidence such as "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence," *Innova*, 381 F.3d at 1116, and extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.

In construing a patent claim, the court first looks at the "intrinsic evidence of record ... [which is] the patent itself, including the claims, the specification and, if in evidence the prosecution history." *Vitronics*, 90 F.3d at 1582. Intrinsic evidence is the primary and most significant source of evidence in construing the patent claims. *Id.* The court begins its consideration of intrinsic evidence by considering the claim terms, which are the terms used to define " 'what it is that is patented.' " *Phillips*, 415 F.3d at 1312 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 570, 24 L.Ed. 235 (1876)). The Court also looks at the context in which the claim term is being used. *See id.* at 1314 (stating that "the context in which a term is used in the asserted claim can be highly instructive."); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed.Cir.2003) (stating that "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."). The court also looks at other claims in the patent "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. The Court also considers the specification of which the claims are a part.

■ The specification is a written description of the invention and the drawings which are submitted to the patent office. The claims are the numbered paragraphs

which appear at the end of the specification. Thus, the claims must be read in light of the specification and cannot be construed in a manner which is inconsistent with the specification. *See Markman,* 517 U.S. at 389, 116 S.Ct. 1384 (stating that a "term can be defined only in a way that comports with the instrument as a whole."); *Merck & Co. v. Teva Pharms., USA, Inc.,* 347 F.3d 1367, 1371 (Fed.Cir. 2003) ("A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document. Thus claims must be construed so as to be consistent with the specification, of which they are a part.") (internal citations omitted).

In considering the specification, it is important to note that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips,* 415 F.3d at 1317. If a patentee does choose to act as his or her own lexicographer it is his or her own meaning which controls. *See Teleflex, Inc. v. Ficosa North America Corp.,* 299 F.3d 1313, 1325 (Fed.Cir.2002) ("The patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."); *Vitronics Corp.,* 90 F.3d at 1582 ("Although words in a claim are generally to be given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."). "[T]he specification is always highly relevant to the claim construction analysis [and is] [u]sually ... dispositive ... [as] it is the single best guide to the meaning of a disputed term." *Id.*

In considering the intrinsic evidence, the prosecution history of the claim is also considered if it is in evidence. *Phillips,* 415 F.3d at 1317. The prosecution history is the "complete record of all the proceedings before the Patent and Trademark Office ('PTO'), including any express representations made by the applicant regarding the scope of the claims." *Vitronics,* 90 F.3d at 1582. "The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'" *Chimie v. PPG Industries, Inc.,* 402 F.3d 1371, 1384 (Fed.Cir. 2005) (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1580 (Fed.Cir.1988)). However, the Federal Circuit has cautioned that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips,* 415 F.3d at 1317.

Finally, after considering the intrinsic evidence, the Court may look to extrinsic evidence such as " 'expert and inventor testimony, dictionaries, and learned treatises.' " *Id.* (quoting *Markman,* 52 F.3d at 980). However, "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term and [i]n such circumstances, it is improper to rely on extrinsic evidence." *Vitronics,* 90 F.3d at 1583. It is best if the court "focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down." *Phillips,* 415 F.3d at 1321.

## III. *PATENT CLAIMS AT ISSUE*

■ To better understand the rulings set forth in this Order, it is necessary to

examine the claims that E–Loan is alleged to have infringed, namely claims 1, 2, 7–12, 19–21 and 26–31, which the Court has transcribed below.

### A. *Method Claims*

The first claim in issue, claim 1, is an independent method claim that discloses:

A method for processing loan applications, said method including the steps of maintaining a database of pending loan applications and their statuses at a database server, wherein each party to a loan can search and modify that database consistent with their role in the transaction by requests to said server from a client device associated with their role.

'947 Patent, Col. 14:66–15:5.

Claims 2 and 7–12 are dependent method claims that derive from claim 1. Thus, claim 2 is "[a] method as in claim 1, wherein said loan applications comprise home mortgage loan applications." *Id.*, Col. 15:6–7.

Claim 7 is "[a] method as in claim 1, wherein said roles include a lender and said client device includes a lender station associated with at least one said lender; and said lender can search the database for particular desired types of loans, and can bid on loan applications." *Id.*, Col. 15:23–28.

Claim 8 is "[a] method as in claim 7, wherein said lender is notified when its bid is accepted." *Id.*, Col. 15:29–30.

Claim 9 is "[a] method as in claim 1, wherein said database includes tags for loans using identifiers which might be of interest to lenders." *Id.*, Col. 15:31–33.

Claim 10 is "[a] method as in claim 9, wherein said identifiers include a property location, borrower credit information, or CRA qualification for the property." *Id.*, Col. 15:34–36.

Claim 11 is "[a] method as in claim 1, wherein said database includes computed values which might be of interest to lenders." *Id.*, Col. 15:37–38.

Claim 12 is "[a] method as in claim 11, wherein said computed values include a credit score." *Id.*, Col. 15:39–40.

### B. *System Claims*

By contrast, claim 19 is an independent system claim that discloses:

A system for processing loan applications, said system including a database of pending loan applications, said database including status information regarding said pending loan applications; a transaction server, said transaction server being responsive in real time to requests from parties to said pending loan applications, said requests including requests for searching and requests for modifying said database consistent with roles for said parties.

*Id.*, Col. 15:59–16:2.

Claims 20–21 and 26–31 are dependent system claims that derive from claim 19. Thus, claim 20 is "[a] system as in claim 19, including a client device associated with each said party." *Id.*, Col. 16:3–4.

Claim 21 is "[a] system as in claim 19, wherein said pending loan applications comprise home mortgage loan applications." *Id.*, Col. 16:5–6.

Claim 26 is "[a] system as in claim 19, including a lender station associated with at least one said lender; wherein said lender system is capable of requesting said transaction server to search said database for particular desired types of loans, and is capable of submitting bids on loan applications to said transaction server." *Id.*, Col. 16:24–29.

Claim 27 is "[a] system as in claim 26, including a message notifying said lender when its bid is accepted." *Id.*, Col. 30–31.

Claim 28 is "[a] system as in claim **19**, wherein said database includes tags for loans using identifiers which might be of interest to lenders." *Id.*, Col. 16:32–34.

Claim 29 is "[a] system as in claim **28**, wherein said identifiers include a property location, borrower credit information, or CRA qualification for the property." *Id.*, Col. 16:35–37.

Claim 30 is "[a] system as in claim **19**, wherein said database includes computed values which might be of interest to lenders." *Id.*, Col. 16:38–40.

Claim 31 is "[a] system as in claim **30**, wherein said computed values include a credit score." *Id.*, Col. 16:41–42.

## IV. *ANALYSIS*

### A. *Disputed Term 1 ("Loan Application")*[2]

Although the parties agree that the Court should construe the term "loan application" for the purposes of this lawsuit as it is used expressly in claims 1, 2, 7, 19 and 21 and implicitly in most—if not all— of the remaining contested claims, they offer competing proposed definitions. The Court adopts IMX's proposed definition of a "loan application" to mean "a request for an extension of credit in a format that contains sufficiently detailed information to enable a lender to grant (subject to the provision and verification of any information needed to complete the loan) or deny the request" (Pltf. Markman Brief ("Pltf. M.B.") at 12–13).

This definition of "loan application" is adapted from a related case, in which the United States District Court for the District of Delaware concluded, "[c]onsistent with the claim language, the specification and the prosecution history," the term means "a request for an extension of credit in a format that contains sufficiently detailed information to enable a lender to grant or deny the request." *IMX, Inc. v. Lendingtree, LLC,* No. 03–1067–SLR, 2005 WL 6218927, at *1 (D.Del. Dec. 16, 2005).

As IMX notes, however, the patent specification also provides that, after the borrower accepts the loan terms offered by the lender, it will still be necessary for the borrower to transmit a "complete loan application" so that the lender may "verif[y] the prospective loan information or other formalities" before "complet[ing] the loan." '947 Patent, Col. 14:3–7. Therefore, the Court agrees with IMX that it is appropriate to add the words that appear in parentheses below, such that "loan application" in the '947 Patent means: "a request for an extension of credit in a format that contains sufficiently detailed information to enable a lender to grant (subject to the provision and verification of any information needed to complete the loan) or deny the request."

The Court declines to adopt E–Loan's proposal to define "loan application" as "an application which includes a loan profile which comprises information about the prospective loan, a set of bids, each of which comprises an offer to make the loan from a particular lender, and a set of status information, which relates to the processing of the loan application using the system" (Deft. Markman Brief ("Deft. M.B.") at 7–8). E–Loan contends that the term "loan application" in the '947 Patent must include a component that identifies a

---

**2.** Although IMX only sought the Court's construction of a single term—"loan application"—E-Loan sought the Court's construction of 17 separate terms (including "loan application"). And, in their *Markman* briefs, the parties addressed each of E–Loan's proposed term constructions in separately-numbered paragraphs. For ease of reference, the Court will adopt the parties' numbering system in this Order and utilize section headings that refer to "Disputed Terms 1–17," which will correspond to the order that the parties discussed E–Loan's arguments in their respective *Markman* briefs.

"set of bids" that potential lenders have offered with respect to that particular loan application because a "conventional loan application, [which does] not includ[e] a set of bids attribute," would "not allow the bidding feature which is at the core of the '947 Patent" (*id.* at 8).

However, the bidding component of the invention is described in its preferred embodiment only, while the patent claims themselves are not so narrow. The Court therefore construes the patent by reference to the claims and does not limit it to the preferred embodiment. *See Comaper Corp. v. Antec, Inc.,* 596 F.3d 1343, 1348 (Fed.Cir.2010) ("[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment."). Moreover, the limitation that E–Loan seeks to impose upon the Patent as a whole—i.e., that it discloses a method and system for plurality of potential lenders to bid on loan applications—is a limitation depicted in the independent claims, namely claims 3 and 22. '947 Patent, Col. 15:8–10 ("A method as in claim 1, wherein said database can be modified by entering bids on a loan application from one of a plurality of potential lenders."); *accord id.,* Col. 16:7–12. Thus, the doctrine of claim differentiation supports the inference that the bidding function described in dependent claims 3 and 22 is not present in independent claims 1 and 19. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1314–15 (Fed.Cir.2005) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

### B. *Disputed Terms 2–4, 7, 14–16*

For the reasons discussed above, the Court rejects E–Loan's contention that it is necessary to construe the following terms beyond their ordinary meaning for the purposes of this lawsuit: "processing loan applications" (Disputed Term 2), "transaction" (Disputed Term 3), "each party to a loan can search and modify that database consistent with their role in the transaction" (Disputed Term 4), "status" (Disputed Term 7), "consistent with their role in the transaction" (Disputed Term 14), "consistent with said roles for said parties" (Disputed Term 15), and "pending" (Disputed Term 16). Although a computerized bidding system involving a plurality of lenders is described in the preferred embodiment of the patent, the claim terms are not so narrowly drawn, and the invention therefore encompasses more than the preferred embodiment. *See Kara Tech. Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed.Cir.2009) ("The claims, not the specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

### C. *Disputed Terms 5–6, 8–9 (Computer–Related Terms)*

E–Loan contends that the following computer-related terms require construction by the Court: "transaction server" (Disputed Term 5), "client device identified with their role" (Disputed Term 6), "database server" (Disputed Term 8), and "lender station" (Disputed Term 9). According to E–Loan, it is necessary to limit the meaning of these terms to "general purpose" computers that can be configured in relation to the specific term at issue. Thus, E–Loan asserts that a "transaction server" is "a general-purpose computer used to store and manage information to support real-time trading of loan applications," a "lender station" is a "general purpose computer operating lender-specific software to interact with the transaction server," and so on.

The Court rejects E–Loan's argument that it is necessary to define these terms as applying "general-purpose" computers simply because the specification mentions the words "general purpose." First, the specification is not limited to general purpose computers only, as it expressly states that those "skilled in the art would recognize" that "the invention can be implemented using general purpose switching processors *or special purpose switching processors or other circuits adapted to particular process steps and data structures* described herein...." '947 Patent, Col. 3:1–6 (emphasis added). Second, it is well established that the "specification may impart a definition that differs from a term's ordinary meaning only when it demonstrates 'an intent to deviate from' that meaning," *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick,* 573 F.3d 1290, 1296 (Fed.Cir. 2009) (quoting *Voda v. Cordis Corp.,* 536 F.3d 1311, 1320 (Fed.Cir.2008)), and that a patentee will be held to have acted as his own lexicographer by redefining a claim term in the specification only if he "clearly express[es] that intent in the written description" and only if the "statement in the specification [has] sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1370 (Fed.Cir.2005).

Nothing in the claims or in the specification evinces an intent to limit the definition of the Disputed Terms at issue here to "general purpose" computers. Thus, there is no reason to depart from the ordinary meaning of those terms and narrow their definitions in accordance with E–Loan's proposal.

Consistent with the parties' agreement, however, the Court will construe the term "database server" to mean "transaction server." With this clarification, the re-maining disputed terms are comprehensible in context and can retain their ordinary meaning without the need for further interpretation (Pltf. Markman Rebuttal ("Pltf. M.R.") at 11).

### D. *Disputed Term 10 ("Lender Station is Capable of Submitting Bids")*

E–Loan does not explain the basis for its proposal to construe the words "lender station is capable of submitting bids" to mean that the "lender station sends the database loan offers and criteria associated with the loan offers such as expiration date." In the absence of any explanation, the Court sees no need to construe this term, which clearly intends to convey that the lender station gives the potential lender the capacity to make an offer on a pending loan application.

### E. *Disputed Term 11 ("Being Responsive in Real–Time")*

Similarly, E–Loan fails to offer any explanation to support its contention that the words "being responsive in real-time" should be construed to mean "immediately responding." The expression "being responsive in real-time" has an ordinary meaning in the context of the '947 Patent, which does not require further interpretation. And, to the extent that any further interpretation is necessary, the Court also notes that the portions of the specification cited by E–Loan in its *Markman* brief neither compel nor support the conclusion that "being responsive in real-time" means "immediately responding." *See, e.g.,* '947 Patent, Col. 4:47 (referring to "real time quotes for 10 year Treasury notes"), Col. 11:57–58 (referring to "viewing real time market data").

### F. *Disputed Terms 12–13 ("Tags" and "Identifiers")*

Once again, without any explanatory basis, E–Loan asserts that the terms "tags" and "identifiers" should be construed by

the Court. According to E–Loan, "tags" mean "an indication of loan or type or qualification," while "identifiers" means "at least one type of loan amount, property location, property appraisal, borrower credit information, and potential CRA qualification for the property." The Court, however, finds that the claims themselves do not require any additional interpretation. Besides, the passages in the specification that E–Loan cites as support for its proposed definitions indicate that the examples of "tags" and "identifiers" are meant to be illustrative, not exhaustive. '947 Patent, Col. 11:5–10 ("[T]he transaction server ... computes aggregate tags for the loan profile so as to respond to specialized lender queries, *such as* whether the loan profile is for a 'prime' loan or a 'subprime' loan or whether the loan profile is CRA eligible.") (emphasis added); *id.,* Col. 2:32–36 ("The transaction server marks prospective loans in its database by a variety of identifiers which might be of interest to lenders, *including* a loan amount, [etc.]") (emphasis added). *See Abbott Labs. v. Sandoz, Inc.,* 566 F.3d 1282, 1288 (Fed.Cir.2009) ("[C]ourts must take care not to import limitations into the claims from the specification.").

### G. Disputed Term 17 ("Which Might Be of Interest to Lenders")

The Court rejects E–Loan's argument that the term "which might be of interest to lenders" is insolubly ambiguous, rendering claims 9, 11, 28 and 30 indefinite and invalid as a matter of law pursuant to 35 U.S.C. § 112(b). *See Praxair, Inc. v. ATMI, Inc.,* 543 F.3d 1306, 1319 (Fed.Cir. 2008) (quoting *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1371 (Fed.Cir.2001)) (holding that a claim is sufficiently definite "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree.").

The term "which might be of interest to lenders" is only arguably indefinite if the relevant claims are read in isolation, without reference to the specification. This method of interpreting a claim, however, is impermissible. *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.,* 587 F.3d 1339, 1353 (Fed.Cir.2009) (quoting *Energizer Holdings v. Int'l Trade Comm'n,* 435 F.3d 1366, 1370 (Fed.Cir.2006)) ("Claim definiteness is analyzed not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art.")

In light of the specification, the phrase "which might be of interest to lenders" enables a person with an ordinary level of skill in the art to determine its meaning. *See SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1340 (Fed.Cir.2005). For example, the Patent lists, in both general and specific terms, the kinds of "identifiers which might be of interest to lenders." Generally, they might include "a loan amount, property location, property appraisal, borrower credit information, and potential CRA qualification for the property." '947 Patent, Col. 2:32–36. Specifically, they might include "information about the loan, including—loan category (FHLMC, FNMA, Conduit, VA, FHA, or Other); loan amount; loan type, such as adjustable or fixed interest rate; loan duration[—]information about the underlying property, including—property type, such as SFR (single family residence), 2 units, 3 units, or 4 units; property location, by street address, city, county, and state; seller's asking price; appraised value[—and] information about the borrower, including—income and assets, credit history, and any negative information about the borrower (such as bankruptcy filings or debt discharge dates, reports of late mortgage payments)." '947 Patent, Col. 3:53–67.

Likewise, the specification provides that "computed values which might be of interest to lenders" includes, generally, "loan-to-value ratios, qualifying credit scores, and income classification for potential CRA qualification of the loan." *Id.*, Col. 2:37–40. Specifically, those computed values might also consist of "computed information about the loan, including—LTV (loan to value), CLTV (combined loan to value); debt ratios (Front ratio and Back ratio)[;] computed information about the property, including its census tract, its MSA (Metropolitan Statistical Area); its qualification as being in an area with majority population belonging to ethnic minorities; the income qualification for its MSA[; and] computed information about the borrower, including—combined income and combined debt for multiple borrowers; qualifying credit score; CRA qualification for the loan (responsive to the borrower's income, the median income for the property's census tract, and the median income for the property's MSA)." '947 Patent, Col. 4:1–21.

Thus, when the claims and specification are read together as a whole, it is clear what is meant by information "which might be of interest to lenders," notwithstanding E–Loan's unfounded concern that the proverbial price of tea in China might be of interest to an *unreasonable*, hypothetical lender. *See Xerox Corp. v. 3Com Corp.*, 458 F.3d 1310, 1323 (Fed.Cir.2006) ("While those descriptions [of the meaning of the term 'sloppiness space'] are not rigorously precise, they provide adequate guidance . . ., particularly in light of the difficulty of articulating a more exact standard for the concept."); *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119–20 (Fed.Cir.2002) (holding that the term "substantially constant wall thickness" was not impermissibly indefinite even though "[i]t may of course occur that persons experienced in a technologic field will have divergent opinions as to the meaning of a term"); *In re Marosi*, 710 F.2d 799, 803 (Fed.Cir.1983) (holding that the term "essentially free of alkali metal" is not impermissibly indefinite where the patent provides "a general guideline and examples sufficient to enable a person of ordinary skill in the art to determine" the scope of the limitation and where requiring more exacting language would be "impractical"); *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F.Supp.2d 361 (E.D.Tex. 2009) (holding that the term "to a desired degree" was not indefinite despite "requir[ing] foreknowledge on the part of the end user"). Simply put, the detail contained in the specification offers effective guidance with respect to the meaning of the term "which might be of interest to lenders," and makes this case distinguishable from *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed.Cir. 2005), the case upon which E–Loan primarily relies, and where the Federal Circuit determined that the term "aesthetically pleasing" was indefinite because it "fail[ed] to provide any objective way to determine" the scope of the claim. *Id.* at 1356. Based upon a careful review of the record and for the reasons stated above, it is, accordingly,

**ORDERED AND ADJUDGED** that the claim terms of United States Patent Number 5,995,947 are construed as follows:

1. "Loan application" means "a request for an extension of credit in a format that contains sufficiently detailed information to enable a lender to grant (subject to the provision and verification of any information needed to complete the loan) or deny the request."

2. "Database server" means "transaction server."